SPROW *v.* LARONGE ET AL.

(Decided September 17, 1928.)

*Mr. Joseph L. Stern,* for plaintiff.
*Messrs. Mooney, Hahn, Loeser & Keough,* for defendants.

VICKERY, J. This action came into this court on appeal from the common pleas court of Cuyahoga county, and it was tried upon the record that was made in the court below. We have familiarized ourselves with that record, heard the arguments of counsel, and read the briefs, and thus have learned

what the lawsuit is about, and from the record we find that some time back in 1920 several men, ten in all, entered into what they pleased to call a "syndicate." Each member of the syndicate was to put into the fund $5,000, and with this fund they were to make joint purchases of certain parcels of real property in Cuyahoga county, out in the vicinity of Strongsville, Broadview, and State road, and perhaps in other parts of the county. So far as the record shows this agreement or understanding was verbal, and existed more as a gentleman's agreement than as a legal document.

Subsequently, in August of the same year, there having been ten contributors and ten members of this syndicate, William J. Sprow of Sandusky, Ohio, entered the syndicate as the eleventh and last member, and paid into the fund the sum of $5,000. The syndicate from time to time had meetings, and at one time Joseph Laronge and the Laronge Company were made managing agent of the syndicate, and at that time Laronge himself, or the Laronge Company, owned parcels of real estate which he agreed to and did turn over to the syndicate, for which he was to have, as the books show, a certain allowance for commission, or the equivalent of a commission.

Now the syndicate not being a legal entity took title to the various parcels of real property in the names of different persons. Some was carried in the name of A. E. Reister, some in the name of Herman Geltman, and some in the name of Helen Edwards, the latter being private secretary in the office of the Laronge Company. It was understood and agreed between these persons, so far as we can learn, that each one of the eleven members of the

syndicate should be on what is called the "ground floor," and should be equally entitled to profits made out of the various deals that they had made and proposed to make, and should be liable for assessments, and so forth.

In pursuance with this so-called syndicate agreement, they had various meetings and dealt in various parcels of real property, probably not selling much, but buying, and assessments were made voluntarily on the various members of the syndicate until each had paid in, in addition to the original $5,000, something over $4,000, so that each had contributed an amount over $9,000 to this syndicate fund. Ultimately it became a question as to whether or not the title to this real estate ought not to be placed in the name of other persons. This view was brought about by at least one member of the syndicate having got into trouble, a part of the real estate being in his name. It was true he held this in trust, but it might involve litigation, and it seemed that Miss Edwards was somewhat disturbed as to the liabilities that might be incurred by her, and she compelled the board, or members of the syndicate, as it appears upon the record of the syndicate, to disavow any liability that she might have, and to enter on record the fact that she was not liable in any way, that she simply was a naked trustee for the title of the real estate held for the syndicate. Other things occurring made it advisable that some means be devised whereby the titles to the various parcels of real estate should be taken from the persons who held them, and be placed in the name of some body or corporation that was controlled by members of the syndicate. So it seems an agree-

ment was entered into at various meetings, all of the members of the so-called syndicate having been notified, and more than a majority of them attending, by which it was deemed best to organize a corporation, the corporation to have a capital stock of 110 shares, of no par value, and each member of the syndicate to have one-eleventh, or 10 shares, of the stock. This is the reason why 110 shares were fixed upon, there being eleven members of the syndicate, each of whom was to have 10 shares of the stock and each to have an equal interest in the so-called corporation.

Acting under the advice of Mr. George Keeley as counsel, this corporation was formed, and a certificate of incorporation was issued to it in the name of the Broadview-Strongsville Company, and seven of the eleven men subscribed, in pursuance with the arrangement, each to 10 shares of stock in this corporation, and the persons who held this property as trustees for the syndicate quit-claimed all their interest in the property to this corporation, and, as we understand it, the corporation now claims to hold the property only in trust for the members of the syndicate, in equal shares, so that all the members have the same rights and in the same proportion in the corporation as they had in the syndicate.

The condition of the real estate market in the last few years has made it difficult, if not impossible, to realize upon a sale of the property. The evidence shows that the property is worth from $364,000 to $400,000, and the total indebtedness upon the property is not to exceed $150,000, so that there is a net worth to all the members of the syndicate in this property of about $225,000. Of this sum each one

of these eleven members of the syndicate is entitled to an equal share, and among them is Mr. Sprow, the plaintiff in this action.

Now it seems that when this corporation was organized the incorporators were persons in the office of Bernon, Mulligan, Keeley & LeFever, but as the corporation progressed these persons retired and the men who were interested in it became the acting officers and directors, and Mr. Laronge, being one of the eleven, turned over one of his shares of stock to a Mr. Price, an employee, for the purpose of qualifying him as a director, and the record shows that the various persons who signed the subscription blanks were former syndicate members. Mr. Wagner having bought up some one's share owned 2 shares, so, as a matter of fact, there were ten persons, but 11 shares.

Now it seems that Mr. Sprow took part in these various meetings, or was advised of what was going on, and he took no active steps against the organization of the corporation, except that he did not subscribe for stock in the corporation. And perhaps the records of the company are not just exactly what they should be, especially the bookkeeping. It seems that one of the complaints that Mr. Sprow makes is that, by the method of bookkeeping, if a member of the syndicate did not subscribe for stock in this corporation he was relegated to the position of a creditor only, for in the entry upon the books of the corporation, instead of distributing the stock to the various persons, the bookkeeper showed each one of the eleven members of the syndicate as a creditor for nine thousand and some odd dollars, making something over $99,000 in all, so that if the corpora-

tion should adjust its affairs by paying these men their indebtedness, or the claims that they had against the corporation, or that the books showed they had against the corporation, it might result in the earnings being garnered up by some of the inside officers of the corporation.

The record showed that as a matter of fact there never had been a distribution of the stock. Just why, it does not appear. Now this action was brought by Mr. Sprow as one of the syndicate, basing his right of action upon what purports to be a written contract. The singular part of this transaction is that there is no other member of the syndicate that ever saw or knew of a writing or agreement which formed this syndicate. If we were compelled to decide that question, we would say that the weight of evidence is to the effect that there was no writing.

Now it must be remembered that Mr. Sprow did not enter this syndicate until August, 1920, while, as a matter of fact, the syndicate was formed in May, 1920. And another singular thing about this so-called contract is that Mr. Sprow admits that it was dictated by him, and signed by him only, and this long after this agreement was entered into. Apparently he did not have a copy of it before him, and he attempts to tell only his recollection of the agreement. Now the important part of that is that this so-called writing, if it were competent evidence, shows that the syndicate was to last for seven years only, and, if that is so, the seven years having expired or being about to expire when this suit was brought, Mr. Sprow might be within his rights in seeking to maintain this suit for an accounting and

a dissolution and winding up of the affairs of the so-called syndicate, but unfortunately this document is nothing more than a self-serving document made by Mr. Sprow, signed by him, and without anybody ever agreeing to its correctness. On the other hand, there is the testimony of the various members of the syndicate that there was no limitation upon this syndicate as to how long it should exist.

Now the suit, as already stated, is brought for a dissolution of the syndicate, the appointment of a receiver, and the sale of the property. Of course, if there had been an attempt to confiscate Mr. Sprow's interest in this syndicate, and to keep him from participating in the profits, there might be some claim for his suit; but it is openly announced in open court that Mr. Sprow has as much interest in that property as anybody has. There is no attempt to deprive him of his interest in it. The others, I believe, have offered him his share of stock in the corporation, or, if they have not, I understand they are willing to give him his 10 shares of stock, on a par with the other members, and so far as interests are concerned Mr. Sprow has the same interest in that concern that any one else has, and there is no attempt and will be no attempt to deprive him of it, and if each member of the syndicate will not take his respective allotment of the stock, so that the syndicate may be merged in the corporation, the syndicate will still exist and the corporation be a mere trustee for the holding of this title of the property that belongs to the members who contributed the original funds to the syndicate, and who have paid their assessments since that time.

There are charges of misconduct of various kinds

against the members of the syndicate, and particularly against Mr. Laronge; but we cannot see any evidence which would warrant any such conclusions. Everything seems to be regular on its face, and the criticism leveled at certain items and certain things that have been done in connection with the syndicate are all explained by Mr. Laronge, so that we do not see that there is any well-founded claim for any charges against anybody. The fact that the profits from the sale of this property have not materialized as was anticipated is due largely to the inability to market real estate, as there has been such a slump in the real estate of Cuyahoga county for the past few years that it has been impossible to sell the property, and to force it upon the market by a receiver's sale at this time would be a misfortune not only to the other members of the syndicate, but to Mr. Sprow as well. If we are correctly informed by the record, the interest of Mr. Sprow in the property is worth $25,000 to $28,000, whereas he has contributed but $9,000, and if the property were sold at a forced sale by a receiver, judging from the result of other receiverships in this community during the past few years, it would result not only in loss to the other members of the syndicate, but also to this plaintiff.

We do not, therefore, see how Mr. Sprow is entitled to maintain his action. We do think, however, if the syndicate is to be abandoned, Mr. Sprow is entitled to his 10 shares of stock in this corporation, which, together with the 10 shares to each of the other members, would dispose of the entire stock; and the bookkeeping methods should be changed to show the true state of facts on the records, since at

present they do not set forth the true purpose and aim of the corporation.

After going over all this evidence and hearing the arguments of counsel, we are constrained to the conclusion that a decree must be drawn in favor of the defendants, and such a decree may be drawn.

*Decree for defendants.*

SULLIVAN, P. J., and LEVINE, J., concur.